### RAYNOR and others, *appellants, vs.* ROBINSON and others, *respondents.*

J. R., the son and administrator of D. R. deceased, presented a petition to the surrogate, alleging that D. R. was indebted to him, in his lifetime, and at the time of his death, in the sum of $3000, for work and labor, and also for cutting and drawing fire wood for the use of the wife of the intestate, (the mother of J. R.,) and for supplying her with vegetables and waiting and attending upon her necessities during a period of 25 years; she during that time living alone and being deserted by her husband; that such services were rendered, and the labor performed, under the expectation and upon the promise of the intestate that he would devise to J. R. his homestead farm, and certain meadow land; that D. R. died intestate leaving other persons besides the petitioner, entitled to share the lands. The petitioner prayed that he might be allowed to prove his claim, and retain the amount thereof out of the personal estate in his hands. It appeared upon the hearing that the services were rendered during a period of more than 25 years; that no account had ever been kept of what was done; of who did it; or of what was furnished; or of the time when. And no account was ever rendered to D. R. in his lifetime; and there was nothing to show that he was ever aware that he was under any obligation to compensate J. R. by a devise of the land.

*Held* that the presentation of such a demand, for the first time, after the decease of D. R., was calculated to awaken some suspicion as to its validity, and to demand clear and unequivocal evidence of its truth.

That nothing short of this would satisfy the simplest demands of justice and good faith.

That to justify the allowance of the claim, it was indispensable that the proof should establish a contract to pay for the services rendered to the wife of D. R. by a devise of the land. That it could not be upheld upon any other ground; and if the proof fell short of establishing such a contract, or a mutual understanding to that effect, that the claim could not be allowed: 1. Because such was the claim in the petition of J. R., which alleged a special contract to pay for the services by a devise of the land; 2. If there was no special contract, or mutual understanding, to make compensation in a particular way, and at a future time, to wit, by a devise of the lands to take effect upon the death of the promissor, then the remuneration for the services was payable presently, and the claim, or most of it, was barred by the statute of limitations.

Loose declarations of an intestate that he intended his son should have the farm of the former; that it would all be his (the son's;) and that he intended to give it to the son; *held* insufficient to authorize the court to infer an *agreement*, on the part of the intestate, to devise the farm to the son, as a remuneration for personal services.

Raynor *v.* Robinson.

APPEAL from a decree of the surrogate of the county of Suffolk, allowing the claim of Jonathan Robinson against the estate of David Robinson, deceased, for personal services, to the amount of $1250.

*William Wickham,* for the appellants.

*George Miller,* for the respondents.

*By the Court,* Brown, J. Jonathan Robinson, the respondent, is one of the administrators of his late father, David Robinson, deceased, and as such, presented his petition to the surrogate of the county of Suffolk, alleging that the intestate was justly indebted to him in his lifetime, and at the time of his death, in the sum of $3000, for work and labor, and also for cutting and hauling wood and cutting it up at the door, and carrying it into the house, for the use of the wife of the intestate, (the mother of the respondent,) and for supplying her with vegetables and waiting and attending upon her necessities during a period of 25 years, she during that time living alone and being deserted by her husband. That such services were rendered, and the labor performed, under the expectation and upon the promise of the intestate that he would devise to the respondent Jonathan Robinson his homestead farm of the value of $4000, and a tract of meadow of the value of $600, upon Moriche's Island, in the county of Suffolk. That he died intestate seised of the said farm and lands, leaving other persons entitled to share the lands, as well as himself. He prayed for the usual process, to the end that he might prove his claim and retain the amount thereof out of the personal estate in his hands. At the return day of the citation the children and next of kin appeared before the surrogate and denied the existence of the claim, and also set up the statute of limitations as a bar to the recovery thereof. Testimony was taken and the cause heard at length by the surrogate, who made his decree awarding the peti-

tioner $50 a year for 25 years' services ($1250 in all) rendered the father and mother, upon the ground that it was mutually understood the son should receive compensation by a devise of the homestead farm.

The proof shows that the farm consisted of 500 or 600 acres of land with 50 or 60 acres cleared, the residue being in wood. That the respondent Jonathan Robinson had the use of it during the period, or for a large part of the period of time for which the services were claimed. The father and mother lived in a state of separation; she occupying a small dwelling house upon the farm, about 80 rods from the residence of the respondent; her children, I assume, having married and moved away. How or where the husband lived, in the meantime, does not exactly appear, further than that he remained in the same neighborhood, and was occasionally at his son's. The services and necessaries furnished the mother consisted of cutting and preparing fuel for her fire by some of the sons of the respondent. Some one of the respondent's daughters also milking the cow and baking and washing for her, while one of the sons usually slept in the house at night. Similar services were also sometimes rendered her by her married daughters. She was furnished from time to time with some garden vegetables for her table, and a few quarts of corn, occasionally, to feed 10 or 12 fowls which she kept around her house. The respondent says he once bought a barrel of flour for her, and paid for it, and bought her necessaries a number of times at the stores for her, and paid for them himself. It also appears that during the time, he cut from the farm or land of the intestate cord-wood, from time to time, which the respondent says he paid him for. There was also some slight evidence that he did some business for his father, but what it was does not appear. Indeed the father seems to have had no business of any consequence, and the surrogate, in rendering his decree, seems very properly to have regarded this part of the case as of no moment, and the services of little or no value. The claim, in its most favora-

Raynor *v.* Robinson.

ble aspect, is certainly a very novel one, attended by circumstances unusual, if not in some respects unnatural. For the services were those acts of kindness and affectionate regard which most sons would have been happy to have rendered to an aged and lone mother. Besides, they were for the most part the services of her grandchildren, the respondent's sons and daughters, and it is said, in the testimony, the intestate never paid them any thing. In the absence of an express promise, it would be difficult to imply an assumpsit from acts performed under such circumstances. (*Williams* v. *Hutchinson*, 3 *Cowen*, 312.) But this is not all. The services were rendered during a period of more than 25 years. No account was ever kept of what was done, of who did it, or of what was furnished, or of the time when. No account was ever rendered to the intestate in his life, and there is nothing to show he was ever aware that he was under any duty or obligation whatever to compensate his son for these things by a devise of the farm. The presentation of such a demand, for the first time, after the decease of the alleged debtor, and when his lips are forever closed against all defense and explanation, is calculated to awaken some suspicion as to its validity, and to demand clear and unequivocal evidence of its truth. Nothing short of this will satisfy the simplest demands of justice and good faith. The courts have gone quite far enough in favor of this class of claims—farther, I think, than can be justified by reason or strict legal principles. To sustain the decree made by the surrogate, it is indispensable that the proof should establish a contract to pay for the services rendered the mother, by a devise of the land. It cannot be upheld upon any other ground, and if the proof falls short of establishing such a contract, or a mutual understanding to that effect, the claim, or the principal part of it, must fall to the ground. (*Martin* v. *Wright's Adm'rs*, 13 *Wend.* 460, *and the cases there referred to.*) Because, 1st. Such is the claim in the petition of the respondent. He alleges a special contract to pay by a devise of the farm, and

although upon the failure to devise by will, the amount of the recovery is to be measured as in an action upon a quantum meruit, still the foundation of the recovery is the special contract and its subsequent breach. 2d. If there was no special contract, or mutual understanding, to make compensation in a given way, and at a future time, to wit, by the devise of the lands to take effect upon the death of the bargainor or party contracting to make the devise, then the remuneration for the services was payable presently, and the claim, or the most part of it, is barred by the statute of limitations. The contract—a valid subsisting contract—to make the devise of the farm in consideration of the services rendered, must be made out affirmatively by the proof, or the decree cannot be upheld.

It is another circumstance worthy of notice, that no witness was examined who was present when any such agreement was made. It is not pretended that it was reduced to writing, and no one ever heard the parties engaged in any treaty concerning it. If it exists, it is to be inferred from the declarations of the intestate proved upon the hearing. The times at which most of these declarations were made are not given. If they were made after most of the pretended services were rendered, and towards the close of the intestate's life, their effect to make out the agreement would be materially diminished. I now proceed to ascertain what they are. David Robinson, a son of the respondent, heard his grandfather, after telling him, the witness, to take good care of things, say, "it would soon all be father's ; I intend to give it to your father, and it will eventually be yours and your brothers. This he said in relation to keeping cattle off the sprouts. I have heard him say father, when he had the farm, would have enough to pay him for his work he had done for him—services he had performed." Lester Robinson, another son of the respondent, testified : "I had a conversation with my grandfather about working there, a great many times ; he never paid me ; said my father would have

Raynor *v.* Robinson.

the place for the labor he was performing ; told me that, a great many times ; told me, a great many times, he had willed it to my father ; told me he would certainly have the place." Clark Robinson, another son of the respondent, after describing the work done and manure put by his father upon the farm, said : "I have talked with my grandfather about this work and the pay for it. The last time I saw him, before he died, he told me he should give father the home place." Joel Robinson, a witness for the respondent, proved the fact of the intestate having made several wills, in which he gave the homestead farm to the respondent, one of which he destroyed in the witness' presence, a short time, four or six months, before his death. " Heard him say he meant Jonathan should have the homestead : this was when he came to have the writing done." Beulah Terry, a daughter of the respondent, "heard him (grandfather) say he would pay us for all what we had done ; and that he would give father the place from the south end to the Peconic river and meadow." Esther Benjamin, another daughter of the respondent, heard her grandfather say, " We should all be paid for what we had done. He should give us the home place and the meadow." It was also proved, that upon one occasion the old gentleman said to the respondent, " that some of the girls wanted him to get a receipt from him, or he would bring in a bill of $3000, and get it, and the respondent replied, he would not give the receipt unless the intestate gave him a deed." This is substantially the testimony on the part of the respondent, with the exception of his own evidence, to which I shall refer, presently. It proves the recognition by the intestate of some services rendered and expenses incurred by the respondent, for which he was entitled to some remuneration ; and they are also evidence of an intention to devise the farm to him by will. But they come very far short of proving a contract upon the faith of which the services were rendered and the necessaries furnished, by which the intestate was bound

to devise the farm with the meadow land to the respondent as a remuneration therefor. ...

Evidence was given on the part of the appellants which must not be overlooked. John Raynor heard David Robinson, the intestate, say to Jonathan, the respondent, "he had made proposals if he would do so and so, he could occupy a portion of the place. He was to take care of his mother and pay the rates. He said, if you don't do it I shall use other means. Jonathan made no reply. This was 15 years ago." Ruth Raynor testified to the same fact, with this addition, that David said, "when there is a barrel of flour wanted I have got it, and when there is fish wanted I have got that." It is to be remembered, in this connection, that a single barrel of flour is all Jonathan claims to have furnished his mother during the entire 25 years. Bouker Robinson, a witness, "was present at a conversation between Jonathan and the old man, who said to Jonathan he believed he had a bill against him, and if he had he wanted to know it. Jonathan said a number of times over he hadn't any claims, and father (the old gentleman) said he had agreed to support the old lady and pay the taxes on the place, and if he had any charges against him he wanted to know it. Jonathan made no reply." Similar testimony was given by other witnesses. Jonathan Dayton, another witness, had a conversation with Jonathan less than a year before the old man's death, when he told him the old man had destroyed his will. He says, "I told him I heard he had a bill against the old man for $3000, and when the old man died he intended to fetch it in. He said it was as big a lie as ever was told. They were making all this up to hinder the old man from giving me his property." At this stage of the case the respondent recalled David Robinson, and as his evidence corroborates that of the respondent himself, I will quote a part of it. "Father," he says, "bought 3000 bushels of ashes and put on the farm. All the farming he ever did there did not pay expenses. He told grandfather he did not want to stay there, and grand-

father promised to give him the place, and said if you stay here a few years longer the place will be yours." In substance, the testimony of the respondent is to the same effect. After stating the one barrel of flour he furnished his mother, and some necessaries bought at the store, and the services of his daughters and sons to their grandmother, he says : "I never knew my father make any compensation to my children for their services. Father cultivated the best portion of the farm. After he went over the river, he never purchased any ashes ; the lots he put his yard manure on. He cropped them until he cropped them all out, and then gave it up to me, and told me if I would manure it I might have the crop. He said if I would stay there I should have the farm. Said the girls shouldn't have a foot of it ; and when they persuaded him to destroy his last will he repeated it, and said he would give it to me: I told him he was an old man, and he ought to make his will. He said he would. He told me to go to Joel's and get the will written. I said no, he must go, and could have one of the boys." He says he did his father's business for thirty years, but does not say what it was; and makes complaint that he expended money for manure put upon the farm which he never realized by any adequate return. What is worthy of note in his evidence is, that he mentions no contract or agreement or understanding by which he was to have the farm for the services rendered and articles furnished his mother. He does not refer to any language or conversation with his father from which we can infer a promise to devise the farm as a compensation for what he had done. But, on the other hand, he says his father told him if he would manure the farm and stay there he should have it, and the girls should not have a foot of it. I have said I thought it hardly possible to infer an obligation on the part of the father from the nature of the services rendered by the son and his children to his mother ; and I think it still more difficult to infer any agreement to devise the farm as a remuneration for those services, from the loose declarations of the

intestate that he intended Jonathan should have the farm, that it would all be his, and he intended to give it to him ; because Jonathan was his only son, and the most likely person of all others to whom he would give the land, and such a disposition of it was natural and reasonable, and the declarations imply nothing more than an intention to make his son the special object of his bounty, by a devise of the farm, which was already in his possession.

Without pursuing the inquiry farther, I conclude that the evidence is insufficient to make out the contract set out in the petition of the respondent, and if he has rendered any services, or furnished any supplies to his mother, for which he is entitled to recover upon an implied assumpsit, his recovery must be limited to such as were rendered and furnished within six years next before the death of the intestate.

The decree of the surrogate should be reversed.

[KINGS GENERAL TERM, February 10, 1862. *Emott, Brown* and *Scrugham,* Justices.]