## ARGUED AND DETERMINED

IN THE

# COURT OF COMMON PLEAS,

FOR THE

## CITY AND COUNTY OF NEW YORK.

---

### HENRY B. HEWETT v. WILLET BRONSON.

S., who was a cousin of the plaintiff's wife, died suddenly from an attack of illness in the street, and the plaintiff, after a search, having found S.'s remains in the custody of the public authorities for interment as an unknown person, took charge of them, and by his direction the funeral ceremonies were held at the plaintiff's house. All the ordinary funeral expenses were paid by the executor, and the present action was brought to recover for the plaintiff's services in searching for his missing friend, in writing the advertisements for the funeral and sending them to the newspapers, in procuring a clergyman to officiate, and for the use of his house for the deposit of the coffin for a few hours, the assembling of the mourners and the performance of the funeral service, upon the ground that there was an implied obligation on the part of the executor to pay him for these services and for the use of his house, out of the assets of the deceased.

*Held*, that the action could not be maintained; that there was no such implied obligation, and that such service was gratuitous.

A contract will be implied to pay what a service is reasonably worth, where it is manifest, from the nature of the service or the circumstances, that it was undertaken with that understanding upon both sides.

And such an obligation will be implied where the service was rendered without a party's knowledge, if it was an act of necessity, for which he was bound to provide, or where it can be assumed that he necessarily would, had he known of the exigency, required it to have been done, understanding that he was to pay for it.

The services for which such an obligation will be implied are those in which it is obvious that the inducement was the compensation or reward to be received, and in which the party for whom the service was performed had no right to assume that it was to be done for any other consideration, and in this respect services for which an action may be maintained are distinguishable from those which are constantly rendered by one person to another in the common intercourse of life, where pecuniary reward neither enters into the contemplation of those who render or those who receive them, and which are, therefore, gratuitous.

An obligation is implied on the part of an executor or administrator to pay the funeral expenses out of the assets of the deceased, as the burial of the dead is an act of necessity, and the presumption being, in the absence of anything to the contrary, that the deceased wished to be buried in accordance with the usages and customs of society, and meant that the costs and charges thereof should be defrayed out of his estate.

The funeral expenses comprise the outlay or charge incurred for the interment, and the compensation of the person or undertaker, who provides what is necessary and attends to the details of the funeral for hire or reward. All other services for the dead which are not acts of necessity are necessarily gratuitous.

GENERAL TERM, *November*, 1873.

BUCKINGHAM SMITH, a gentleman advanced in life and of feeble health, who resided in Florida, and who had formerly been the diplomatic representative of the United States in Mexico and in Spain, came to the city of New York, and, upon leaving a city railroad car, in the evening, was suddenly seized with some malady, and fell down in the street. He was picked up by a policeman, who, finding he was unable to speak, erroneously supposed him to be intoxicated, and conveyed him to the police station, where he was locked up in the cell for the incarceration of intoxicated persons, and where he died in the course of the night. Deprived of the use of speech, when he was brought to the police office, he attempted to make himself known to the police captain by showing a letter which he had in his pocket with his name upon the envelope, and the captain, assuming it to be his name, made a formal entry in the record of the office: "Buckingham Smith, committed for intoxication." When it was found in the morning that he was dead, his body was taken to Bellevue Hospital, and preparations were made for its interment in the public ground where paupers and unknown persons are buried. A reporter for one of the public

journals came to the police office in the morning for the collection of intelligence, and finding the entry in the record, published as an item of news the commitment of Mr. Smith for intoxication.

The plaintiff was an acquaintance of Mr. Smith, who was a cousin of the plaintiff's wife, and Mr. Smith had been accustomed to stay at his house, and at the time of this occurrence it was his temporary home. He left the plaintiff's house in the morning of January 5th, 1871, after breakfast, and as he did not return at half past five in the afternoon, the plaintiff became alarmed, and went down to a room which Mr. Smith occupied in Thirteenth street, and learned that he had left there at three o'clock that afternoon. The plaintiff then went to different restaurants, but finding no trace of him, returned home. He heard nothing of him the next morning, and says he went in the afternoon with Mr. Williams, the president of the Metropolitan Bank, who was a friend of Mr. Smith, but what he did, if anything, does not appear. The next morning the plaintiff's servant girl called his attention to the account in the newspaper of Mr. Smith's arrest for intoxication, when the plaintiff went to the police station, and learning what had occurred, he went to Bellevue Hospital, and found the body in the dead-house, in a common coffin, ready for interment. The plaintiff gave directions that the body should be brought to his house, from whence he arranged that the funeral should take place. He then wrote the advertisements for the funeral and sent them to the public newspapers, and called a clergyman to officiate at the funeral. The remains were deposited at his house for a few hours only on the day of the funeral, where the friends of the deceased assembled, and where the funeral service was performed by Dr. Bellows. The plaintiff attended the funeral to the vault where the body was deposited temporarily, and he afterwards gave directions to the undertaker to ship the remains to Florida.

The action was brought to recover from the defendant, who is the administrator with the will annexed, $100 for the use of plaintiff's house on the day of the funeral, and $50 for his services in searching for Mr. Smith. The cause was referred to ex-

Judge Clerke, who found that the plaintiff had no cause of action. The plaintiff appealed to the general term.

*Peabody & Baker*, for the appellant.

*Jonathan Edwards*, for the respondent.

BY THE COURT.*—DALY, Chief Justice.—This is a most extraordinary demand. The plaintiff has expended nothing. It was conceded, upon the argument, that the executor has paid all the expenses incurred, and what the plaintiff seeks to recover is compensation for searching for the remains of his wife's cousin; for requesting the clergyman to perform the burial service; for writing the advertisements for the funeral, and sending them to the newspapers; and for the use of his house for the deposit of the coffin for a few hours, for the assembling of the mourners and the performance of the burial service, and I suppose for attending the funeral, which I apprehend is what he means when he says that he attended, with the undertaker, to the laying of the remains in the burial vault. Such a demand would have been remarkable had the plaintiff been a stranger to the deceased; but presented by a man whose house the deceased was in the habit of making his temporary home, with whom he had been on terms of personal intimacy for nearly fifteen years, and who was his wife's cousin, it is extraordinary, and to the credit of humanity it may be questioned if such a claim was ever before presented in a court of justice.

The appellant relies upon *Rappelyea* v. *Russell* (1 Daly, 214), in which we held that the public administrator was bound to pay out of the assets in his hands, the bill of an undertaker, who, as an act of necessity, provided for the interment of the intestate in a manner suitable to her rank in life, she having died without friends or relations in this city to undertake this last office for her. But the present is a very different case. The plaintiff is not one whose general business

* Present, DALY, Ch. J., LOEW and J. F. DALY, JJ.

Hewett v. Bronson.

it is to attend to the burial of the dead, and provide what is necessary for the funeral and interment conformably to the usages of society. What he did in searching for his friend was a gratuitous service, and what he did in respect to the funeral was not an act of necessity. It was not at all necessary that the body should have been removed to his house for the purpose of the funeral. It could as well have been taken by the undertaker to the church, and buried from there, as is frequently done. The charge for opening a church for such a purpose, it appears from the evidence, is $25, whilst the plaintiff demands $100 for the use of his house. The answer to this preposterous claim is, that the taking of the body to the plaintiff's house, and having the funeral service there, was the plaintiff's own act, and was unnecessary. He testifies that there were a great many people present at his house to attend the ceremonies. If this were the fact, then the funeral service should have been held at the church. Mr. Smith was a prominent man, who had represented the United States in foreign countries, and was distinguished as an eminent scholar and historical writer; and if his death drew together a large concourse of people to attend his funeral, it was much more appropriate for the plaintiff to have provided, in the obituary notice, for their assembling at the church, instead of directing the funeral to take place at his own house.

In the common intercourse of life, services are constantly rendered by one person to another, in which pecuniary reward neither enters into the contemplation of those who render, or those who receive them, and which are therefore gratuitous. This is especially so in sickness and in discharging the last offices to the dead. Such services are performed by relatives, friends, acquaintances, or strangers, as a duty, or from motives of humanity; though with physicians, nurses or undertakers, who pursue their avocations as a calling, it is otherwise; and if this action could be maintained, it would follow that an action might be brought to recover compensation for any of those nameless offices which are rendered in sickness, or in the house of mourning during the time of tribulation and death; or, in fact, any service, of any kind, rendered by one to another, if

it were beneficial and involved personal attention and the loss of time.

In the absence of an express agreement, the law implies an obligation to pay what a service is reasonably worth, when from the nature of it, or the circumstances, it is to be inferred that it was undertaken with that understanding upon both sides.

Chief Justice Marshall, when speaking of implied contracts and the large mass of human transactions that depend upon them, remarks that "in such cases parties are supposed to have made such stipulations which as honest, just and fair men they ought to have made." (*Ogden* v. *Saunders*, 12 Wheat. 341.) But while the law will thus infer the existence of an obligation to pay a just and reasonable compensation for a service, it distinguishes between that gratuitous service which men constantly render to one another, and one where it is obvious that the inducement to render it was the pecuniary compensation or reward to be received, and where the other party has no right to assume that it is to be done for any other consideration.

In *Bartholomew* v. *Jackson* (20 Johns. 28), the plaintiff brought the action to recover for his services in removing the defendant's property to save it from being destroyed by fire, the defendant not being present at the time of the conflagration, and it was held that the action could not be maintained. "If," said Platt, J., "a man humanely bestows his labor and even risks his life, in voluntarily aiding to preserve his neighbor's house from destruction by fire, the law considers the service rendered as *gratuitous*, and it therefore forms no ground of action."

In *Dunbar* v. *Williams* (10 Johns. 249), it was held that a physician could not maintain an action for medical services and attendance upon a slave rendered without the knowledge or request of the master, in a case not demanding instant and immediate assistance; but it was conceded that if the service had been an act of necessity, which did not admit of a previous application to the master, the law would raise an *implied assumpsit;* the master being legally bound to make the requi-

site provision for the slave. In *Bowen* v. *Bowen* (2 Bradf. 336), it was held that a contract would not be implied on the part of the deceased to pay his brother for serving for five years in the deceased's store as a clerk; the deceased having clothed and boarded the claimant, there being nothing to show that the services were performed by the claimant expecting to be paid for them, or that the deceased so understood it, or had reason to believe that he was to be charged for the services. And see also, to the same general effect, *Everts* v. *Adams* (12 Johns. 352); *Moore* v. *Moore* (21 How. Pr. 219–224); *People* v. *Supervisors of Kings* (23 Id. 89); *Raynor* v. *Robinson* (36 Barb. 128); *Green* v. *Roberts* (47 Id. 521).

These cases sufficiently illustrate the rule that an obligation will not be implied to remunerate a party for his services, unless the circumstances are such as to show either that there must have been a mutual understanding to that effect, or if rendered without the party's knowledge, that the service was an act of necessity, for which he was legally bound to provide, or where it may be assumed that, if he had known of the exigency, he would have required such a service to have been performed, with the understanding that he was to pay for it.

An analogous distinction exists where services are rendered to the dead. An obligation is implied on the part of executors or administrators, or as they are called in the law, the personal representatives of the deceased, to pay his funeral expenses. In wills it is very common for a testator, before he makes any devise or bequest, to provide for the payment of his just debts and funeral expenses; but where he does not do it, and in all cases of intestacy, an obligation on the part of the personal representatives will be implied to pay the funeral expenses out of the assets, if there be assets. It will be implied because the interment of the deceased is an act of necessity, and it will be inferred, where nothing appears to the contrary, that he wished to be buried in accordance with the customs and usages of society, and meant that the reasonable cost and charges thereof should be defrayed out of his estate. Where there is an executor, as he has the right to direct in what way the funeral is to be conducted, and who is to attend to it, and

provide what is necessary, the executor must, if accessible, be consulted, and in cases of intestacy, as the interment generally takes place before an administrator is or can be appointed, the administrator takes the assets subject to the payment of the funeral expenses, as a debt or charge necessarily created (*see the cases cited* in *Rappelyea* v. *Russell,* 1 Daly, 218). The funeral expenses embrace the outlay or charge incurred in procuring what is necessary for the interment, and the compensation of the person, generally denominated an undertaker, who attends to all the details of the funeral for hire or reward. Beyond this, all such services are usually and from their nature gratuitous, and such was the character of those for which the plaintiff seeks to recover. The report of the referee and the judgment upon it should therefore be affirmed.

Judgment affirmed.