Wilson *v.* Staats.

PETER Q. WILSON et al., appellants,

*v.*

PETER P. STAATS, executor &c., respondent.

1. An executor is justified in paying the funeral expenses of an indigent sister of the testator, for whose use for life the income, and, if necessary, the principal, of one-half of his residuary estate had been given. In such case the funeral expenses are necessaries.

2. An executor's investment on a first mortgage on lands, worth at the time, one-third more than the amount loaned, approved, although loss to the estate subsequently happened; an investment on a second mortgage, exceeding, with the first mortgage, two-thirds of the value of the premises, condemned.

3. An executor holding a bond and mortgage of one who makes an assignment for the benefit of his creditors, and whose estate pays a dividend, is in laches in not presenting the claim on the bond to the assignee.

4. *Semble,* an executor who resells lands bought in by him on foreclosure of mortgages of the estate, need not advertise as on a public sale under the statute.

5. Commissions allowed, no bad faith being shown.

Appeal from decree of Somerset orphans court, on exceptions to the final account of the respondent, executor &c., of Henry M. Wilson, deceased.

*Mr. John Schomp,* for appellants.

*Mr. H. M. Gaston,* for respondent.

THE ORDINARY.

The objections brought before the court for examination and adjudication, will all be disposed of by a decision of the follow-

NOTE.—Even where an estate is insolvent, the representatives may be allowed the expenses of a funeral, suited to the condition of the decedent during life (*2 Wms. on Exrs. 968; Scott* v. *Dorsey, 1 Harr. & Johns. 233; Edwards* v. *Edwards, 2 Cromp. & M. 612*); and such debts are preferred to those of the government (*United States* v. *Eggleston, 4 Sawy. 199.* See *Rex* v. *Wade, 5 Price 621*).

An undertaker may recover of the executor, if employed by him (*Rooney's Estate, 3 Redf. 15; Green* v. *Salmon, 8 Ad. & El. 348; Arbat* v. *Churchland,* ?

Wilson v. Staats.

ing questions: whether the executor had authority, under the provisions of the will, to provide, out of the residue of the estate, for the burial of the testator's sister Jane, to whom and his brother Dowe the use of the residue was given for life; whether the investments of the money of the estate on mortgage of the Voorhees and · Wallace properties, respectively, were proper; whether the executor ought not to have proved the debt on the Wallace bond, under Wallace's assignment for the benefit of his creditors; whether the executor's sale of the property obtained under foreclosure of the Wallace mortgage was on lawful notice, and whether the executor is entitled to any commissions, and if so, at what rate.

The will gave all the residue of the estate to be divided equally between the testator's sister Jane and his brother Dowe, "the money to be put on bond and mortgage, and the interest to be paid to them yearly, for their support;" with the further provision that, "if the interest should prove insufficient for the purpose, then so much of the principal as might be necessary for the purpose, should be applied thereto." These two persons, the legatees, were both poor. One of them appears to have been very sick and imbecile in mind. The testator intended to devote to their support, for life, the entire residuum of his estate, if necessary for the purpose. He first provided that they should have the residue in equal shares; this is followed

You. & Jer. 32); or the expense be afterwards ratified by him (*Lucy* v. *Walrond, 3 Bing. N. C. 841; Meert* v. *Moessard, 1 Moo. & P. 8*).

When furnished at the request of a third person, *query* as to the executor's liability (*Rogers* v. *Price, 3 You. & Jer. 27; Brice* v. *Wilson, 3 Nev. & M. 512; France's Estate, 75 Pa. St. 220; Walker* v. *Taylor, 6 C. & P. 752; Corner* v. *Shew, 3 M. & W. 350; Gregory* v. *Hooker, 1 Hawks 392; Fitzhugh* v. *Fitzhugh, 11 Gratt. 300; Hewett* v. *Bronson, 5 Daly 1*).

As to the representative's personal liability (*Ferrin* v. *Myrick, 53 Barb. 76, 41 N. Y. 315; Rappelyea* v. *Russell, 1 Daly 214*).

A coffin and grave clothes purchased by defendant for his mother-in-law, who died a member of his family, were deemed necessaries (*Thompson* v. *Smith, 57 N. H. 306*. See *Camden* v. *Fletcher, 4 M. & W. 378; Meert* v. *Moessard, 1 Moo. & P. 8*).

If paid by the heir at law voluntarily, he cannot be re-imbursed from the personalty of intestate (*Coleby* v. *Coleby, 12 Jur. (N. S.) 496*).

by the direction that it be invested on bond and mortgage, and the interest paid to them yearly, for their support, and he then adds that if the interest should prove insufficient for the purpose, the principal should be used as far as might be necessary. His language was, "and if the interest should prove insufficient, then so much of the principal must be taken to do it." At their death the principal, or what remained of it, was to be divided among certain persons, whom he designated, as follows: "All my nieces and nephews, sons and daughters of Dowe, sons and daughters of William, sons and daughters of Minard, son of Jane." It is reasonable to hold that under the provision made by the will for Dowe and Jane, neither of whom had any property, expenses of their decent burial, if borne by the executor or trustee, would be allowable credits in his account. He paid the expenses of the burial of Jane. It cannot be doubted that the testator contemplated that the expenses of such burial should, if necessary, be paid out of the residue. It seems to have been necessary for the executor to provide for Jane's burial, and the amount expended for the purpose appears to have been reasonable. The funeral expenses were necessaries.

To consider the investments made by the executor. One, of $5,000, was on mortgage of the Voorhees property, a farm of seventy-nine acres, in Hillsborough township, in Somerset county, and

A son is not liable on a parol promise to pay an undertaker for making his mother's coffin, where she had remarried, and at the time of her death was living with her husband (*Youngs* v. *Shough, 3 Green 27*).

Nor is a pauper under obligation to borrow the money necessary to bury his child (*Reg.* v. *Vann, 15 Jur. 1090.* See *Kavanan's Case, 1 Me. 226*).

A step-father was allowed the funeral expenses of his step-son, who was a lunatic, out of his lands (*Carter* v. *Beard, 10 Sim. 7*).

Even where a wife has a separate estate, her husband is liable for her funeral expenses (*Chapple* v. *Cooper, 13 M. & W. 259; Patterson* v. *Patterson, 59 N. Y. 583; Smyley* v. *Reese, 53 Ala. 89; Sears* v. *Giddey, 41 Mich. 590; Weld* v. *Walker, 14 Am. Law. Rev. 57.* But see *Gregory* v. *Lockyer, 6 Madd. 90; Willeter* v. *Dobie, 2 K. & J. 647; McCord* v. *McKinley, 92 Ill. 11; McCue* v. *Garvey, 14 Hun 562, 3 Redf. 313*).

Although living apart (*Jenkins* v. *Tucker, 1 H. Bl. 90; Ambrose* v. *Kerrison, 10 C. B. 776; Bradshaw* v. *Beard, 12 C. B. (N. S.) 344; Cunningham* v. *Reardon, 98 Mass. 538*).

Wilson *v.* Staats.

the other, of $2,000, was on a second mortgage of a lot in Millstone, with a store, dwelling-house and barn thereon. The history of the investments appears to be as follows : at the settlement of his first account, the executor had in hand for investment, as the residue of the estate, the sum of $6,981.28. The settlement took place in 1864. In the spring of 1865, he lent to one Gabriel, on mortgage of his farm, $4,000, and afterwards, in the same spring, he lent $5,000 to Abraham Voorhees, on his farm above mentioned. It is obvious that after the loan to Gabriel, he had not $5,000 to lend to Voorhees, but only about $3,000. In order to make the loan of $5,000, he added $600 of his own money and $1,400 of the money of his brother John to the $3,000 of the estate. Gabriel, in 1869, paid off his mortgage, and out of the money received from him, the executor paid his brother John his $1,400 and retained his own $600. The balance of the money, $2,000, he invested in April 1869, on a second mortgage of the Wallace property, which consisted, as before stated, of a lot (of thirty-six hundredths of acre) in Millstone, on which was a store-house, dwelling-house, and barn, and on which property there was already a mortgage for $1,300. The interest was regularly paid on the Voorhees mortgage up to 1876. In that year only $200 of the interest were paid. In 1877 only $50, and in 1878 $350 were paid. No payment was made in 1879, and the executor then proceeded to foreclose the

Whether paying funeral expenses renders one an executor *de son tort* (see *Camden* v. *Fletcher*, *4 M. & W. 378; Harrison* v. *Rowley, 4 Ves. 216 ; Bennett* v. *Ives, 30 Conn. 329 ; Magner* v. *Ryan, 19 Mo. 196*).

A direction to a person to pay the expenses of a last illness and funeral expenses, in case of death, out of a particular fund, will not constitute him executor according to the tenor (*Toorney's Case, 3 Sw. & Tr. 562*). Nor a direction to a legatee to pay such expenses out of his legacy (*Smith's Case, 10 Jur.* (*N. S.*) *1084*).

Administration may be granted to one who has supplied funeral expenses, as a creditor (*Fowler's Case, 16 Jur. 894; Newcombe* v. *Beloe, L. R. (1 P. & M.) 314*).

If the estate be insolvent the usual amount allowed is £20 (*Yardley* v. *Arnold, Car. & M. 434*) ; and £103 was held to be too much (*Edwards* v. *Edwards, 2 Cromp. & M. 612*) ; the amount is generally discretionary with the court (*Scott* v. *Dorsey, 1 Harr. & Johns. 233*).

mortgage. At the sheriff's sale under foreclosure, the property was sold for $3,460. It was not bought in. The Wallace property was sold in the fall of 1871, under foreclosure proceedings instituted the previous summer by the executor on his mortgage, and was bought in by him for the estate, for $1,500, subject to the first mortgage. He held it until the winter of 1879, when he sold it at public sale to Henry McDonald, for $2,000.

In the spring of the year in the summer of which the executor began the foreclosure suit on the Wallace mortgage, Wallace made an assignment for the equal benefit of his creditors. The executor did not put in his claim under it. The claims of the creditors who did so were compromised by the assignees, by the payment of forty cents on the dollar.

It appears that Abraham Voorhees paid for the Voorhees property $8,482, about $108 an acre. The time when he purchased it does not appear, but it seems to have been about the time of the giving of the mortgage. If its value was then $8,428, the amount lent upon it, $5,000, was less than two-thirds of the value. The interest was paid regularly for ten years, up to 1876. In that year $200 were paid for interest; the next year $50, and the next $350, and the payment of interest having ceased, the executor, in 1879, began to foreclose. I do not think that he is answerable for the loss to the estate on that loan. The mortgage was taken in 1865. Between that time and 1873 the

The cost of ordinary mourning apparel for the family of the decedent, may be sanctioned (*Campfield* v. *Ely, 1 Green 150* ; *Wood's Estate, 1 Ashm. 314;* Pitt v. *Pitt, 2 Lee 508 ; Paice* v. *Archbishop of Canterbury, 14 Ves. 364 ; Bridge* v. *Brown, 2 You. & Coll. 186 ; Frederic* v. *Frederic, 10 Mart. 188 ;* but see *Griswold* v. *Chandler, 5 N. H. 492; Johnson* v. *Baker, 2 C. & P. 207 ; Macknet* v. *Macknet, 9 C. E. Gr. 296 ; Holbert's Succession, 3 La. Ann. 436 ; Flintham's Appeal, 11 S. & R. 16*) ; and the cost of a wake (*McCue* v. *Garvey, 14 Hun 562*).

The expenses of a tombstone have been held allowable (*2 Wms. on Exrs. 969, note; Ferrin* v. *Myrick, 53 Barb. 76, 41 N. Y. 315 ; Luckey's Case, 4 Redf. 95;* but see *Foley* v. *Bushway, 71 Ill. 386 ; Morgan* v. *Morgan, 83 Ill. 196 ; Lerch* v. *Emmett, 44 Ind. 331 ; Erlacher's Case, 3 Redf. 8 ; Bridge* v. *Brown, 2 You. & Coll. 185*).

The expense of a *post mortem* is not authorized (*Smith* v. *McLaughlin, 77 Ill. 596*) ; nor moneys spent to procure the arrest, trial and punishment of decedent's murderer (*Lusk* v. *Anderson, 1 Metc. (Ky.) 426 ; Jones* v. *Beall, 19*

price of real estate rose. In the latter year a great revulsion took place, and it fell enormously. The executor swears that when the mortgage was taken he considered that the property, without the buildings (it is said that such a house as that on the farm would now cost $4,000), was worth the amount of the mortgage. He contributed of his own funds $600 to the loan. His brother John, who contributed $1,400, as before stated, testifies that he considered the property worth $100 an acre . at the time the loan was made. No witness is produced to say that the property was not a good security when the mortgage was taken, and I am left to conclude that the security was abundant when the loan was made, and that the loss sustained is due to the depreciation which attended the great revulsion before referred to. One of the witnesses, John W. Smock, says that if the property had been kept in good repair, he would not consider it worth now more than half what it would have brought eight or ten years ago.

The Wallace property was of a different character. It was a valuable village property. It is said to have been the best stand for business on that side of the river. Rynear S. Merrell testifies that when the executor obtained his mortgage on it, he (Merrell) thought it a good security for that loan, and he also says it had been sold for over $4,000. The executor testifies that when he made the loan he knew the property had been sold for $4,300

*Ga. 171.* See *Killebrew* v. *Murphy, 3 Heisk. 546 ; Harrell* v. *Davenport, 5 Jones Eq. 4*) ; nor for feasts or ornaments (*Shelley's Case, 1 Salk. 296 ; Toller's Exr. 246*) ; nor for writing funeral notices and procuring a clergyman to officiate (*Hewett* v. *Bronson, 5 Daly 1*); nor for the use of plaintiff's house during the funeral ceremonies (*Ibid*). *Littell's Case, MS. N. J. Prerog. Ct., Oct., 1876.*

Decedent's lands may be sold to pay his funeral expenses (*Walker* v. *Diehl, 79 Ill. 473 ; Clayton* v. *Somers, 12 C. E. Gr. 230 ; Owens* v. *Bloom, 14 Hun 296.* See *Carter* v. *Beard, 10 Sim. 7*).

If sued by an administrator for a debt of his intestate, the defendant may offset a demand for money paid by him for intestate's funeral (*Adams* v. *Butts, 16 Pick. 343 ; Patterson* v. *Patterson, 59 N. Y. 574.* See *Harte* v. *Houchin, 50 Ind. 327*).

Counts for funeral expenses cannot be joined with counts on promises made to the testator in his lifetime (*Myer* v. *Cole, 12 Johns. 349 ; Demott* v. *Field, 7 Cow. 58.* See, further, *10 Cent. L. J. 303, 325*).—REP.

just before the mortgage was given, which was in 1864. He got the mortgage by assignment in 1869. The interest on the first mortgage, which was for $1,300, was paid up until the year before the executor foreclosed his mortgage. It is said that between the time when the $2,000 mortgage was given and the time when the executor took his assignment of it, property in Millstone rose in value; but if it did, it does not appear how much. Both mortgages on the property were purchase-money mortgages. I have no doubt the executor regarded this as a proper investment when it was made, notwithstanding it was a second mortgage, but I am constrained to the conviction that it was not. The two mortgages together amounted to almost four-fifths of the value of the property, judging by the price it brought in 1866, and if it appreciated at all between that time and 1869, when the executor took the assignment, it does not appear by any evidence that it appreciated enough to make the loan on the second mortgage a safe one; and there is indeed no evidence that it appreciated at all. Nor will the executor's allegation that he could not find a better security avail to discharge him from responsibility. It does not appear that he tried to find any after the money was paid in by Gabriel. Though he says, in the beginning of his testimony, that he could get no place to invest the money on first mortgage for some time, subsequently he says he had the money on hand about a week before he invested it in the Wallace mortgage, and he adds that he had promised the money to Beardsley, who assigned the mortgage to him. He says Gabriel paid him the money in April. It must have been the 1st of that month, for the assignment from Beardsley to the executor is dated the 2d of April.

Again, the executor did not discharge his duty to the estate in regard to the claim which the personal responsibility of Wallace on the bond enabled him to make on the property of Wallace not covered by the mortgage. He says he did not put in his claim against Wallace's estate in the hands of the assignees, because he held a mortgage. If the mortgaged premises were worth the amount of the mortgage at that time, he should have got the money for his mortgage. Mr. Smock, one of the assign-

ees of Wallace, says he offered $3,500 for the property then, and he considered it worth about $4,000. At the same time, he says the assignees offered it for sale, and could get no offer or bid for it. He appears to have been in the occupation of the property at the time as a tenant, and perhaps was therefore willing to buy it. It may be added that it does not appear that the property was then—in the spring of 1871, before the financial panic occurred—worth more than $4,000. Elmendorf, the other assignee of Wallace, says Smock was anxious to buy, and that he (Elmendorf) thought the price Smock offered (which was $3,500) was the full value of the property. But further, the executor might have put in his claim under the assignment, and if he had done so he would have been entitled to a dividend on the amount of any deficiency left after applying the proceeds of the sale of the mortgaged premises to the payment of his debt. *Bell* v. *Fleming's Exrs., 1 Beas. 13.* His omission to do so was a dereliction of duty. As before stated, the estate paid, on compromise, forty per cent. The executor should be held responsible for the loss on this loan, and therefore all his claims for allowance in respect to the property after it was bought in by him must be disallowed, and of course the charges against him for rents received from it will be stricken from the other side of the account. I have no doubt he acted honestly in the matter of this loan, but he not only took a second mortgage for security, but he did not observe the rule by which prudent business men are governed in their investments of their own money on mortgage of real estate, not to lend to the extent of more than two-thirds of the value of the property. I am constrained, therefore, to visit the loss on him rather than on the estate.

While this conclusion renders it unnecessary to pass on the question raised as to whether the executor, if that property was the property of the estate when he sold it, was not bound to advertise it according to the directions of the act " relative to sales of land under a public statute or by virtue of any judicial proceedings " (*Rev. 1040*), it may be remarked that the sale was not within the provisions of that act.

The executor has not, I am satisfied, been guilty of any intentional wrong or misconduct in the discharge of the duties of his

office, and he ought not, therefore, to be deprived of his commissions. The commissions will be computed according to the rule laid down on the subject in *Tucker* v. *Tucker, 6 Stew. Eq. 235 ;* that is, he is entitled to commissions on the amount on which he is to be allowed commissions in the third or final account at the same rate at which they would have been allowed had the money on which they are computed constituted part of those accounted for in the former accounts. He is to be allowed commissions only once on the entire estate, notwithstanding the several accountings, and that only at the statutory rate, taking all the sums on which commissions are computed together, and applying the statute thereto accordingly.

The decree of the orphans court will be reversed in the respects above indicated, but without costs.