# CHARLESTON.

## CANN v. CANN et al.

Submitted September 8, 1894—Decided December 19, 1894.

1. ADMINISTRATOR—STATUTE OF LIMITATIONS.

An administrator who presents a personal demand against his decedent's estate must show that such demand is just and valid, and not barred by the statute of limitations. The statute of limitations does not begin to run until the right of action accrues.

2. UNDELIVERED WRITING—DUE BILL.

An action or suit can not be maintained on an undelivered writing or due bill found among the supposed debtor's papers after his death.

3 . UNDELIVERED WRITING—STATUTE OF LIMITATIONS.

Such writing, so found, is not sufficient acknowledgment to prevent the bar of the statute of limitations, but may, if genuine, be admissible as evidence to establish a *quantum meruit*.

4. ADMINISTRATOR—SON'S SERVICES.

Where a son, who is also the administrator of his father's estate, sues such estate for wages claimed for services rendered before his father's death, he can not recover unless he proves an express contract, or the facts and circumstances sustained by a preponderance of testimony clearly establish an expectation or intention on the part of his father to compensate him for such services.

FAULKNER & WALKER, W. II. TRAVERS and C. H. SYME for appellant:

"*A report of a commissioner unless excepted to will be presumed by the court as admitted to be correct, not only, as to the principles of the account, but as to the evidence also.*"—21 W. Va. 262; 22 W. Va. 159; 24 W. Va. 524.

"*A party complaining of a commissioner's report must point out the errors of which he complains by exception thereto so as to direct the mind of the court to it, and when he does so the parts not excepted to are presumed to be correct,*" "*both as to the principles, and the evidence on which the parts are founded.*"—14 W. Va. 531; 18 W. Va. 185; 21 W. Va. (body of opinion, page 270); 19 W. Va. 459.

*Exceptions in general terms amount only to a personal allegation.*—19 W. Va. 459.

*Exceptions to a commissioners report must state some principle upon which the commissioner erred, or some fact, otherwise the court must disregard the exception.*—2 Danl. Chan. Prac. 1315, 1316; 29 Ala. 393; 2 Sum. 108; 13 Peters 359; 21 W. Va. 271; 14 W. Va. 521; 10 W. Va. 298; 12 W. Va. 402.

*Adult defendants failing to except to commissioner's report will not be permitted to impeach it, either at the hearing of the cause, or in the appellate court.*—10 W. Va. 645; 8 W. Va. 218; 17 Gratt. 85; 12 W. Va. 213.

*Exceptions to a commissioner's report must be stated so that the court can decide upon the equity, or legality of the principal only, upon which the article is admitted or rejected. The error must be pointed out with reasonable certainty.*—2 H. & M. 422; 21 W. Va. 271; 14 W. Va. 559; 26 W. Va. 540; 25 W. Va. 417.

*Where questions purely of fact are referred to a commissioner, his findings will be given great weight, and should be sustained unless it plainly appear that they are not warranted by any reasonable view of the evidence.*—26 W. Va. 710; 14 W. Va. 1; 21 W. Va. 698; 33 W. Va. 160; 38 W. Va. 370; 30 W. Va. 147.

*Under the prayer for general relief, the plaintiff is entitled to such relief as is agreeable to the case made in the bill though different from the specific relief prayed for.*—38 Pa. St. 155; (98 Am. Dec. 248).

"*Under prayer for general relief any relief may be granted*

*which is suitable to the case, and consistent with the allega-
tions and proofs."*—St. Eq. Pl. § 40; 2 Rob. Prac. (old)
293, and cases therein cited; 1 Barton Chan. Prac. 267; 1
Munford 549; 2 Rand 401; 15 Gratt. 400; 17 Gratt. 85; 21
Gratt. 60; 4 W. Va. 107; 26 Gratt. 571; 8 Leigh 513; 38 W.
Va. 408; 4 W. Va. 107; 22 W. Va. 404; 1 Bland, 251; 20 N.
J. Equity 367; 1 Danl. Chan. Prac. 434; 1 Munford 554,
note; 3 Munford 29; 19 S. E. Rep. 845.   "Under the general
prayer the complainant is entitled to any relief consist-
ent with the case made, though inconsistent with the spe-
cial relief prayed for."   8 Wood 339; 18 Ala. 371; 15 Md.
82.

*Statute of limitations could not apply in this case.*—122 U. S.
176; 78 Va. 683; 14 W. Va. 222; Code of West Virginia, c.
104, s. 8; 1 Wood on Limitations 24 and 25; 1 Cranch 90;
1 Cranch 55; 23 W. Va. 717; 24 W. Va. 594.

*If the Statute of limitations could apply (which is denied) it
could only extend to the interest of the party pleading it.*—
3 Bland Chan. Rep. (Md.) 500, 501; Maryland Rep. 100.

D. B. LUCAS for appellees cited, 23 W. Va. 241; 33 W.
Va. 574; 88 N. Y. 92; 2 Bla. Com. 511; 3 Id. 18, 19; 25
W. Va. 830.

DENT, JUDGE:

At March rules, 1883, in the clerk's office of Morgan coun-
ty, Harrison Cann filed his bill in chancery against the heirs
of his father's estate to enforce payment of his claim for ser-
vices rendered as evidenced by a certain duebill bearing date
the 28th day of April, 1880, calling for three thousand dol-
lars for services rendered by the plaintiff "since he became
twenty-one years of age."   The plaintiff made himself a
party defendant to this bill as administrator of decedent.

The only appearance for the defendants is the answer of
the infants Silas Largent and Elizabeth Largent, by their
guardian *ad litem,* T. N. B. Davis; an answer filed by George
W. Ziler, husband of one of the heirs, and an exception en-
dorsed on the commissioner's report by the defendants Cath-
erine Ziler, Susan E. Ambrose, and Sarah Cann.   The bill is

not taken for confessed as to any of the defendants, but on service of sermons an order of reference is entered to ascertain the debts and their priorities against the estate of Jacob Cann, deceased, and the estate liable to the payment of the same. From the commissioner's report it appears that the personal estate was amply sufficient to pay all the debts against the decedent, with the exception of plaintiff's claim, and that is the only matter of controversy in the suit, without which no suit would have been necessary.

According to the law and the decision of this Court in the case of *Rader* v. *Neal*, 13 W. Va. 373, in this suit concerning his wife's separate estate, George W. Ziler was not a necessary party thereto, and therefore the answer filed by him cannot be regarded, as he is too remotely interested in the subject matter to contest plaintiff's claim in his own right.

The adult defendants who are proper parties to the suit did not think it worth while to contest the allegations of the bill, but contented themselves with indorsing the following exceptions on the commissioner's report: "The within report is excepted to by Catherine Ziler, Susan E. Ambrose, and Sarah Cann so far as it allows Harrison Cann a claim against the estate, amounting, principal and interest, to four thousand nine hundred and twenty-four dollars and fifty cents, all of which should be rejected as improperly allowed." The report being in accord with the allegations of the bill, to which these defendants made no appearance, but allowed it to go uncontroverted so far as they were concerned, this exception should have been disregarded by the court, or promptly overruled, as by their silence in not pleading they have admitted the justice of the claim. As to them, neither the report of the commissioner nor any proofs are necessary to support a decree justified by their confession.

It is not so with the infant defendants, who are under the protection of the court, and whose interests must be regarded and preserved by it. The plaintiff has placed himself in an anomalous, though not inequitable position by making himself, not only as the administrator of Jacob Cann, deceased, but also as the administrator of Elizabeth Largent, deceased, defendant to his own bill. If the claim on which

he sues is just beyond controversy, there could be nothing wrong in so doing, as equity readily recognizes and distinguishes between personal and representative rights, and can shape its decrees accordingly. But where the obligation of defense rests upon him in his representative capacity, equity will not permit him to make himself, in such capacity, a defendant to his own personal bill, and then treat such bill as taken for confessed as to his decedent's estate, but will require him to establish the debt claimed by him against such estate as fully and completely as though all defense that could possibly be made to such debt were properly interposed to its allowance. If this were not true, and he, by this means, secured the allowance of an illegal debt against the estate of his decedent, he would become personally liable for its payment, and so he has gained nothing by his suit. In section 5, chapter 87, of the Code, it is provided that, "if any personal representative, guardian, curator or committee shall pay any debt, the recovery of which could be prevented by reason of illegality of consideration or lapse of time, or by any other fact within his knowledge, no credit shall be given him therefor." This law applies equally as well where an individual claim of the fiduciary is presented for allowance as where a debt has been paid by him, and the duty devolves upon the court and commissioner before whom his accounts are presented to prevent the auditing against the estate of any illegal claim; wherefore it becomes incumbent on the court in this case to say whether the claim presented by the plaintiff in his personal character has been shown to be a proper charge against the estate of the decedent. The bill charges that the decedent, in pursuance of a contract made with the plaintiff to pay him a reasonable compensation for his services as a common laborer on his father's (decedent) lands, since he became twenty one years of age, executed to the plaintiff his note or due-bill on the 28th day of April, 1880, for three thousand dollars. The evidence of plaintiff shows that some time after his father's death he found this due-bill written in his father's account book. It is also shown that it was in the father's handwriting. If

this due-bill had been delivered by the deceased to plaintiff, his right to recover would have been beyond question. It not only was not delivered, but plaintiff had no notice of its existence until it came to his hands as the administrator of decedent's estate. Not being delivered, it had no binding force. *Curtis* v. *Gorman*, 19 Ill. 141; *Thomas* v. *Watkins*, 16 Wis. 549; *Prather* v. *Zulauf*, 38 Ind. 155. To allow it to be used as an admission or acknowledgment of an indebtedness would, in effect, make it a valid legal instrument, and hence the law requiring delivery would be thwarted. Nor can it be treated as such an acknowledgment in writing as will avoid the statute of limitations. In 13 Am. & Eng. Enc. Law, p. 760, the law is stated as follows, to wit: "To make the acknowledgment complete, it must, however, be communicated to some one; and consequently a paper which was never delivered, but was found among the debtor's papers after his death, cannot operate as an acknowledgment." Also: "A mere writing acknowledging a debt, which is retained by the person making it, and which is never delivered, either to the creditor or to any one else, cannot have the effect of preventing the operation of the statute." *Pershing* v. *Canfield*, 70 Mo. 140; *Merriam* v. *Leonard*, 6 Cush. 151.

For the purposes of this suit under the law as we find it the due-bill relied on is worthless unless it can be treated as an admission of indebtedness on the part of the decedent. In Chamberlayne's Best, Ev. 486, it is said that a written admission, void as an obligation, is admissible as evidence, although the maker is deceased, and such admission be in the form of a book entry. This appears to be consonant with reason and justice if the admission as alleged is shown to be genuine and indisputable; but where its genuineness is attacked, and it is not sustained by a clear preponderance of legal testimony, its weight as evidence is destroyed, and it should be received with the greatest caution, if at all.

The commissioner to whom the matter was referred finds in favor of the genuineness of the paper, but the court, on an examination of the evidence, overrules and disaffirms the report. Hence it devolves upon this Court to determine for

itself from the facts and circumstances disclosed by the record whether it will sustain the conclusion of the commissioner or that of the Circuit Court. *Roots* v. *Kilbreth*, 32 W. Va. 585 (9 S. E. Rep. 927).

Examining the evidence, we find that the following nine witnesses introduced by the plaintiff, to wit, Lewis Allen, George Blakely, J. H. Buzzard, William P. Smith, H. Clay Spohr, Edmund Pendleton, Franklin Farris, Albetto Mendenhall and J. S. Duckwall (an attorney for plaintiff), testify more or less strongly that they are acquainted with the handwriting of Jacob Cann, deceased, and that they believe the signature to the controverted paper to be his. Another witness for the plaintiff, John W. Bechtol, who was well acquainted with decedent's signature when written with a pen, testifies that he is unable to say that the signature in controversy written with a pencil is his genuine signature. On the other hand, the following seven witnesses, to wit, William J. Fleece, Andrew J. Davis, John J. Hertzel, Jefferson Vandersoll, John Frederick, William Z. Catlett, and Joshua Ziler, testify just as strongly, and some of them even more emphatically, that the controverted signature is not the genuine signature of the decedent, and some of them give good reasons for the belief that is in them. The latter are sustained by many of the circumstances surrounding the transaction. The plaintiff himself states that, although he was looking carefully through his father's papers and books for something of the kind, he did not discover this due-bill until he had looked through this little account book three times, and not until some time after his father's death; and he never made the discovery known to his mother or sisters until he had failed to get the latter to deed him the home farm, even though he promised them to will it to their children; and they testify that they did not know it until after this suit was brought, nearly two years after the death of their father, and then their first information did not come from their brother, although he had ample opportunity to inform them. On the contrary, he did inform one of his sisters, about six months after the death of his father, that he had examined his books and papers carefully, and

could find nothing in his own favor except a credit for one hog. His concealment of this matter from his sisters, and making no claim for compensation to them for his services, until after this suit was instituted, is certainly a very strong circumstance against plaintiff's claim. In addition, Isaiah J. Smith, a witness for plaintiff, states that in the December before Jacob Cann's death, which happened in August, decedent told him "he always intended Harrison should have the home place." This was almost eight months after the date of the controverted paper. Silas J. Largent testified that some four or five months before his death Jacob Cann told him he expected to leave Harrison Cann the home place and what was on it—almost one year after the date of the paper. John Turner testifies that Jacob Cann told him the same thing, but his date is indefinite. All these witnesses approached Jacob Cann at the instance of Harrison, and the latter tried to get him to sign a paper to the effect that he would give Harrison the home farm, but he declined to do so, saying, "I will give him something to show for his work after a while." H. Clay Spohr's evidence is to the same effect.

These witnesses certainly prove that there was a persistent effort on the part of Harrison Cann to get his father to deed him the home farm, even up until his death, which the decedent just as persistently declined to do. But there was no intimation at any time to any of these witnesses that said paper writing was in existence. The consideration for any such paper is left by the evidence in very great doubt, especially when the incompetent testimony is expunged from the record. In the case of *Riley* v. *Riley*, 38 W. Va. 290, (18 S. E. Rep. 569), Judge Holt, quoting from 17 Am. & Eng. Enc. Law, 336, states the law governing cases of this character as follows, to wit: "But where it is shown that the person rendering the service is a member of the family of the person served and receiving support therein either as parent, child, or other near relative, a presumption of law arises that such services were gratuitous. * * * Therefore, before the person rendering the service can recover, the express promise of the party served must be shown, or such

facts and circumstances as will authorize the jury to find the services were rendered in the expectation by one of receiving and by the other of making compensation." There is no express contract proven in this case. And the facts and circumstances show that Harrison Cann lived along with his father, by his own admissions, working and farming for himself, receiving his board and clothes, and doing very much as he pleased; that he never pretended to make any charge or keep any account of his services, but that he was continuously importuning his father to give him the home place, which his father at times stated it was his intention to do.

John W. Nolan, a witness for the defendants, states "that about a year before the death of Jacob Cann he had a conversation with Harrison Cann, in which he asked him how he was getting along with his work, and he said, 'Not very well; he was doing for the old man; that the old man was not doing much for him.' I made mention to Harrison that I would talk to the old man for him. He said he didn't think it would do any good, but I could do as I pleased about that." Afterwards, he says, he fell in with Jacob Cann, and says: "I asked him if he oughtn't to do something for Tip, and he told me he had done more for Tip than any of the balance of the children. Well, he said Tip had stock on the place. He said he knowed what Tip wanted. If he would deed him the home place, he would be satisfied and that he never would do while his head was above the top of the ground. He said Tip wanted all from the other heirs; poor John, he said, especially." Tip was Harrison's nickname.

William J. Fleece testifies that about the month of March, 1880, the plaintiff stated to him that he was getting up in years, and that he had worked a long time, and had no guaranty for it, and requested him to see his father, and ascertain whether he would leave him the farm before he left the world, or make some arrangement to compensate or pay him for his work. Harrison Cann made this request twice, and then the witness says: "I went there, and found Mr. Cann there alone entirely. After talking over other things, I told

him what I came there for; that Harrison Cann, his son, requested me to come to see him, to know from him what he would leave or give Harrison, his son, if he would go to work on the farm, attend to his father's things, and have whatever he agreed to give him put in writing. He (Jacob Cann) said he would not agree to give him anything, and have it put down in writing, but he might come there and go to work on the farm as he had done. He would board him. He might have all he made on the farm except one field. That Harrison Cann had never done as much for him as his daughter Kate had. That he had paid money for Harrison, bought him clothes, and that Harrison had been working the most of the time for himself. Other things were said by him. His exact words I do not remember, but he left me under the impression that his son John was a better boy to him than his son Harrison." The witness further testified that he reported to Harrison his father's reply. This is the testimony of two uncontradicted witnesses, acting in the capacity of agents for the plaintiff. And they certainly show that Jacob Cann had no expectation of making compensation to Harrison for his services, and this fact was communicated to him; and if he had any right of suit at that time he should have brought it in his father's lifetime. James D. McCool testifies that in the month of February before his death he met with Jacob Cann, when "he commenced talking about his family and children. He said that he never intended to make a will, for, said he, 'Tip, my son, is so damned contrary. He will work for a while,' he said, 'then lounge about, and I have to keep him and his stock, and I consider him a bill of expense to me; while my girls are at home, working for the family, all the time, and I just think the laws of my state can make a better will than I can.' " This statement is not properly admissible testimony, except as a mere circumstance, in a case of this kind, involving so many grave doubts.

Taking the evidence as a whole, it is certainly a matter of impossibility to pronounce the controverted writing to be a genuine paper; but, the Court being of the opinion that neither the Circuit Court nor the commissioner has yet passed

upon the plaintiff's claim for compensation independent of such writing, and that there is evidence tending to show his right to maintain his suit on a *quantum meruit* for such compensation, and that the allegations of the bill are sufficient therefor, the decree in this case is reversed, and the same is remanded to the Circuit Court, with directions to recommit the same to a commissioner thereof, for the purpose of ascertaining, if any, what amount is legally due the said plaintiff from his father's estate for services rendered from the time he became of age until the death of his father, and that said case be further heard and determined according to the rules of law and equity.

---

HOLT, JUDGE (*concurring*):

The following state of facts is disclosed by this record as alleged in the pleadings proved by the testimony and found by the commissioner: The plaintiff, Harrison Cann, was born on the 15th day of October, 1840, and became twenty one on the 15th day of October, 1861. From that period up to the death of his father, on the 5th day of August, 1881, a period of twenty years, he lived with and worked for his father at his home, and unmarried, on the promise and assurance made to him by his father, who was the owner of twenty four different tracts of land, that he would leave him by will the home place of about three hundred and twenty one and three-fourths acres, and worth three or four thousand dollars. In 1879-80 plaintiff became dissatisfied about the uncertainty of getting the farm or any other compensation for his labor, and got several of his friends to talk to his father on the subject. The father told these intermediaries that plaintiff would be standing in his own light if he left home; that, if he remained at home, and took care of them, he always intended he should have the home place; that he intended to compensate him. Thus induced, the plaintiff remained with his father and mother down to their death. At the death of the father was found his book of accounts, containing thirty seven pages of items of debit and credit entered for and against some twenty five or thirty different

persons, and among them were two items of charge against plaintiff, Harrison Cann, of three hogs, at two separate times, and the following entry in the handwriting of Jacob Cann:

"1880, April 28. Due Harrison Cann, three thousand dollars, for services since twenty one years of age. Signed Jacob Cann"—all in pencil.

Jacob Cann died intestate on the 5th day of August, 1881, leaving his widow, Susan Cann, and five children: Plaintiff, Harrison Cann; John, who died intestate and unmarried since his father; Catherine Ziler, wife of George W. Ziler; Elizabeth Largent, wife of Silas J. Largent and Emma Ambrose, wife of Jesse H. Ambrose.

He left some personal property, about enough to pay all just claims except that of plaintiff, and two thousand, eight hundred and fifty seven and three-fourths acres of land in twenty four separate tracts.

Plaintiff qualified as administrator on the 31st day of August, 1881, and found in the drawer of decedent the above account book. He tried to get his sisters to convey him the home place, but they failed and refused to go on with it after three of them had signed the deed.

On the first Monday in March, 1883, he brought a creditor's bill against the heirs and administrator. In the bill is contained a specification of his claim against the estate as follows: "The plaintiff further says that from the time he became twenty one years of age, which was on the 15th day of October, 1861, up to and until his father's death, a period of twenty years, in pursuance of a contract between his father and himself, he remained with his father, and worked for him as a common laborer on his father's lands, his father promising to pay him a reasonable compensation therefor. And accordingly, in pursuance of the contract and understanding between his father and himself, his father, on the 28th day of April, 1880, executed to the plaintiff his note or due-bill for three thousand dollars, 'for services rendered him by the plaintiff since he became twenty one years of age.'" The four heirs, sisters of plaintiff, seem to have recognized to some extent the justice of plaintiff's claim, and in

performance of what the father was supposed to have promised to do went so far as to sign a deed conveying the home-place to plaintiff, their brother, but for some reason refused to go on and complete it.

No one answered the bill except George W. Ziler, the son-in-law who had no interest, and he pleads the statute of limitations; but Mrs. L. Largent died during the suit, and her children, both infants, answered in 1890 (April 7th), by their guardian *ad litem*. On the 4th day of April, 1883, an order of reference was entered, referring the cause to Commissioner J. R. Smith, to report the claims, hear proof, etc. The commissioner took and returned the testimony of thirty one witnesses, filing his report on the 8th day of December, 1890. He finds and reports the due-bill of three thousand dollars to be a valid claim against the estate of the said Jacob Cann, deceased, and that plaintiff is entitled to receive the same, with interest from the 28th day of April, 1880. But he further reports that "Jacob Cann was satisfied with the consideration for said due-bill when he executed the same, by naming the consideration therein, which consideration is strongly supported and established as valuable by the evidence herewith returned;" and the testimony of eight or ten witnesses, who knew his services rendered, put the value thereof at at least one hundred and fifty dollars per year for the twenty years. The report is excepted to by the two daughters and the widow. On the 27th day of November, 1891, the cause came on to be heard, and the court, being of opinion that the claim reported in favor of plaintiff was not sustained by the evidence, sustained the exception, disallowed the claim, confirmed the report in other respects, and gave plaintiff leave to file an amended bill. What amendment the court deemed necessary does not appear, but I infer it related to the due-bill. This appeal was allowed plaintiff.. I propose to consider the case first on the theory that the entry found in decedent's book of accounts is not only ineffectual as a testamentary paper, but is wholly nugatory for any purpose.

*First*. As to the pleading. Plaintiff's claim for a *quantum meruit* against the estate is presented and set forth in

his bill explicitly, specifically, and with all the definiteness of detail of individual characteristics that the claim is capable of.

*Second.* Plaintiff has presented it in a court of equity, the proper forum, for he asks to have real assets descended. administered and applied in satisfaction of his claim. See Code (Ed. 1891) c. 86, ss. 3, 4.

*Third.* What is the nature and binding force of his claim, if made out by the proof? That there was an express agreement between his father, the decedent, and himself, that the father would devise him the "home place," or otherwise make him a reasonable compensation for his services, if plaintiff would work for decedent on his lands, and take care of him for life; that he performed his part of the contract, but his father left his part unperformed, unless the duebill found entered on his book of accounts shall be held to be an execution of the contract on the part of the father; if not, he claims compensation for what his services shall be shown to be reasonably worth.

*Fourth.* What is the evidence of his claim? By the testimony of at least ten witnesses his claim is proved and established, and it is proved that in performing his part of the agreement he spent twenty years of the best part of his life, that is to say from twenty one to forty one, and that the deceased accepted these services knowing that plaintiff was relying upon his promise to compensate him in some testamentary way.

*Fifth.* On this mass of testimony he had in his favor in the Circuit Court a *quasi* verdict in the finding and report of a patient, careful, intelligent commissioner, who knew and saw the witnesses face to face, and calls them "intelligent and unbiased." This, in my view, for the practical administration of justice, establishes the agreement and the performing of it on plaintiff's part, for such finding of fact by the commissioner of what he was directed to ascertain and report has in general great weight. Here it bears the marks of deserving what the law accords, and the claim itself bears internal marks of being deserving, and of legal obligation. I do not think that the action of the Circuit

Court has, for the purposes of this Court, done away with the findings of the commissioner, and set the matter wholly at large. That would be unreasonable. It still stands upon its own merits, whatever they may be, as the ascertainment of a fact depending on conflicting evidence, without anything to prevent this Court going into the evidence to ascertain for itself the facts and draw its own conclusions; but there is no presumption against his report merely by reason of the action of the court below. See *Roots* v. *Kilbreth*, 32 W. Va. 585 (9 S. E. Rep. 927). Can not the action of the Circuit Court in disregarding or overruling such ascertainment of a fact by the commissioner be appealed from and reviewed in that court, where the rule is constantly laid down? See *Oteri* v. *Scalzo*, 145 U. S. 578 (12 Sup. Ct. 895); *Kimberly* v. *Arms*, 129 U. S. 512 (9 Sup. Ct. 355); *Crawford* v. *Neal*, 144 U. S. 585 (12 Sup. Ct. 355); *Medsker* v. *Bonebrake*, 108 U. S. 66 (2 Sup. Ct. 351); *Tilgham* v. *Proctor*, 125 U. S. 136 (8 Sup. Ct. 894); *Callaghan* v. *Myers*, 128 U. S. 617 (9 Sup. Ct. 177); *Camden* v. *Stuart*, 144 U. S. 104 (12 Sup. Ct. 585); *Cook* v. *Railroad Co.* (N. Y. App.) (39 N. E. Rep. 2).

1. Silas J. Largent, a brother-in-law, and one of the defendants, says: That four or five months before his death Jacob Cann told him that if his son Harrison continued to live with him, and to do as he had done, he intended to leave him the home place and what was on it. This was said while plaintiff was dissatisfied because his father did not give him something to show for his promise. That plaintiff did continue to live with his father thereafter until the latter's death.

2. John Turner. He knew the family of decedent during the fourteen or fifteen years before his death. Plaintiff did most of the work; managed the farm. His services were worth two hundred dollars per year. Some four years before he testified, decedent, while on the home place, told him that Tip ( a nickname of plaintiff) was a good fellow, and when he was gone he intended to leave him the home place and all that was on it; that all the others had left him. Afterwards there was some misunderstanding about it, and at the instance of plaintiff he saw decedent about it, to fix it

up. He told decedent that plaintiff wanted him to give him something to show for the place or his work. He replied, "I will give Tip something to show for his work after a while." This was communicated by witness to plaintiff.

3. George Dunn. Plaintiff worked on the farm steadily, fixed up the dwelling house, stables, blacksmith shop, granary, wagon shed, the fences, and put the farm in good order generally. He was a good hand, worked steady, *etc.* Was worth, managing, working, *etc.*, two hundred dollars per year. This, witness, who worked on the place, knew during a period of ten or twelve years.

4. H. Clay Spohr. Had known the parties all his life. Forty-three years of age. Been there very frequently. Decedent marrid his half-sister. Had conversation about the matter; the last time in 1880-81. Decedent told wittness Harrison, the plaintiff, was the only one that was of any service to him, and he intended to reward him for it. He intended to give him the home place, and farming implements. He said, the last time the witness talked to him about it, that some one was trying to persuade plaintiff away from him, "but if he stays I will reward him well for it." At another time he said he would give him the home farm if he stayed.

5. Jesse Ambrose is a defendant and brother-in-law. Had known plaintiff as living with decedent for more than sixteen years, farming for his father; blacksmithing, wagon-making, any kind of work about the farm; putting in crops, gathering, threshing and saving it. He worked at carpentering—put up buildings on the farm. Farm contains about three hundred acres.

6. Isaiah J. Smith. Had been there frequently, from a day to a week at a time. Had known decedent forty four years, plaintiff twenty five years. Plaintiff was of good habits, sober and industrious. Did all kinds of work. Was worth three hundred dollars per year. In December before decedent's death (August 5, 1881,) plaintiff complained to him that he had worked a number of years without ever having received any compensation, and that he would leave home if he did not get some satisfaction for the

services he had rendered; and at plaintiff's instance he spoke to decedent on the subject. Decedent answered that plaintiff stood in his own light if he left home; that if he remained at home, and cared for them, he always intended he should have the home place; and plaintiff was persuaded, and remained till his father's death. He always found plaintiff at the head of the labor force and management of the farm. He was engaged in all kinds of farm labor, and did blacksmithing, *etc.*, besides.

7. Adam Spring. Plaintiff, during the latter part of Jacob Cann's life, took charge of his affairs, putting out and gathering crops, and attending generally to the labor on the farm. Was worth about one hundred and fifty dollars per year.

8. Susan Cann, the mother. Plaintiff was born in 1840. Has never married, but has resided at home, doing all kinds of work; putting in and gathering the crops; a good deal of work of all kinds; made fence, built stable, corn house, granary, made plows, harrows, wagons. He was an industrious, sober boy. He has spent all his best years on the place, twenty odd years since he has been his own man.

Plaintiff's own testimony and a part of his mother's are not given because incompetent. It was disregarded by the commissioner. This has been enough to convince me that the father, a man of property, owning twenty four tracts of land, held out to the only child remaining with him to the last the inducement of testamentary compensation.

On it the son acted, and steadily, soberly, efficiently gave to his father's service the first twenty years of his manhood, reaching from twenty one well up into middle life. The father's promise miscarried. That he is entitled to a *quantum meruit* compensation, I put in evidence this long list of cases. Many of them show not only the general doctrine of legal obligation, but, what is most to my purpose, illustrate the mode, the means, and the force of what has been regarded as safe, satisfying proof in such cases: *Grant* v. *Grant* (1893) 63 Conn. 530 (38 Am. St. Rep. 379, note 393); *Wainright* v. *Talcott*, 60 Conn. 43 (22 Atl. 484); *Reynolds* v. *Robinson* (1876) 64 N. Y. 589; *Eaton* v. *Benton*, 2. Hill 576; *William*

v. *Hutchinson* (1850) 3 N. Y. 312 (53 Am. Dec. 301, 306, note); *Parsell* v. *Stryker*, 41 N. Y. 480; *Newell* v. *Keith*, 11 Vt. 214; *Johnson* v. *Hubbell* (1855) 10 N. J. Eq. 332 (66 Am. Dec. 773 784, note); *Hawkins* v. *Ball* (1857) 18 B. Mon. 816 (68 Am. Dec. 755, 758, note); *Carmichael* v. *Carmichael* (1888) 72 Mich. 76 (40 N. W. Rep. 173, and 16 Am. St. Rep. 528, 534, note); *Snyder* v. *Castor*, 4 Yeates, 353, 358; *Gary* v. *James*, 4 Desaus. Eq. 185; *Walker's Estate*, 3 Rawle 243; *Milier* v. *Lash*, 85 N. C. 51; *Shakespeare* v. *Markham*, 10 Hun. 322 (72 N. Y. 406); *Raynor* v. *Robinson* (1862) 36 Barb. 128, 131 (28 N. Y. 494); *Quackenbush* v. *Ehle*, 5 Barb. 472; *Campbell* v. *Campbell*, 65 Barb. 644; *Martin* v. *Wright* (1835) 13 Wend. 460 (28 Am. Dec. 468, 471, note); *Wright* v. *Tinsley* (1860) 30 Mo. 389; *Gupton* v. *Gupton* (1870) 47 Mo. 37; *Sutton* v. *Hayden* (1876) 62 Mo. 101; *Teats* v. *Flanders* (1893) 118 Mo. 660 (24 S. W. Rep. 126); *Newton* v. *Newton* (1891) 46 Minn. 33 (48 N. W. Rep. 450); *Schutt* v. *Society* (1886) 41 N. J. Eq. 115 (3 Atl. 398); *Stone* v. *Todd* (1887) 49 N. J. Law, 275 (8 Atl. 300); *Whetstine* v. *Wilson* (1889) 104 N. C. 385 (10 S. E. Rep. 471;) *Huguley* v. *Lanier*, 86 Ga. 636 (12 S. E. Rep. 922, and Am. St. Rep. 487, note); *Hudson* v. *Hudson*, 87 Ga. 678 (13 S. E. Rep. 583); *Wallace* v. *Long*, 105 Ind. 522 (5 N. E. Rep. 666); *Day* v. *Wilson*, 83 Ind. 463; *Ham* v. *Goodrich*, 37 N. H. 185; *Emery* v. *Smith*, 46 N. H. 151; *Leslie* v. *Smith*, 32 Mich. 64; *Sutton* v. *Rowley*, 44 Mich. 112 (6 N. W. Rep. 216); *Welch* v. *Lawson*, 32 Miss. 170; *Bender* v. *Bender*, 37 Pa. St. 419; *Clark* v. *Davidsson*, 53 Wis. 317 (10 N. W. Rep. 384); *Howard* v. *Brower*, 37 Ohio St. 402; *Ellis* v. *Cary*, 74 Wis. 176 (42 N. W. Rep. 352); *Manning* v. *Pippen*, 86 Ala. 357 (5 South. 572, and 11 Am. St. Rep. 46, note); *Wellington* v. *Apthorp*, 145 Mass. 69, 72 (13 N. E. Rep. 10); *Taylor* v. *Wood*, 4 Lea, 504; *Frost* v. *Tarr*, 53 Ind. 390. By these authorities I show that, where there is an express agreement between a father and a son that the father will devise the home place to the son, or in some testamentary way compensate him for his services, if the son will attend to and take care of him for life, and the son performs his part of the agreement, he is entitled to recover upon a *quantum meruit* for his services if the father's part of the contract is unperformed. See *Grant* v. *Grant* (Conn.) 29

Atl. 15 (38 Am. St. Rep. 393) note; *Hudson* v. *Hudson*, 87 Ga. 678 (13 S. E. Rep. 583)—that it is a valid contract, though not in writing, not forbidden by the statute of frauds, and not barred by the statute of limitations, until the prescribed period has run since the death of the promisor before the bringing of the suit. *Raynor* v. *Robinson* was a case much like this in its facts; was discussed and decided in the surrogate's court, in the Supreme Court (1862) 36 Barb. 128, and finally in the court of appeals, 28 N. Y. 494, the latter holding that where services are rendered by one person to another in pursuance of a mutual understanding and agreement between the parties that conpensation shall be made for them by will, and the party receiving the services dies without making the expected compensation, the party rendering the services is entitled to compensation out of the estate of the deceased as a creditor for the value of the services. *Robinson* v. *Raynor* (1864) 24 N. Y. 494; Bish. Cont. § 224; 2 Chit. Cont. (11th Am. Ed.) p. 798, note g; 2 Whart. Cont. § 719; Lawson, Cont. § 38; *Stewart* v. *Small* (Ind. App.; 1894) (38 N. E. Rep. 826).

*Sixth.* But there may be danger of abuse. In many cases there is a peculiar danger of abuse, requiring, therefore, peculiar guards against it; requiring the court to be on its guard not to let things done under the impulse of affection in discharge of a moral duty, usurp the place of a legal duty discharged, and thereby create a legal right. See *Houck* v. *Houck* (1882) 99 Pa. St. 552, and many cases of like kind. See 2 Pars. Cont. (8th Ed.) pp. 50, 51, notes, and cases cited. It may in some cases have been held to create a *quasi* obligation to compensate, raised by law out of the special circumstances of particular cases, but by the great weight of authority has not reached that point. The law requires, under such circumstances, the sanction of an agreement to compensate, express or by inference fairly and clearly arising out of what is said and done by both parties, that if the one shall work and care for his aged parent so long as he shall live, he, the father, will compensate the son in some testamentary way; and if in pursuance thereof the son performs his part of the agreement, which the father adopts

and enjoys as long as he lives, but neglects to do his part, or his testamentary paper attempted in execution thereof miscarries, or from any cause proves ineffectual, then the son's right to action against the estate accrues, and the only question is, what does he deserve to have as the value of the services rendered? On what possible ground can the superadded moral element on his part, or the abortive testamentary paper on the father's part, destroy or impair his legal right to a *quantum meruit* compensation?

*Seventh.* But it is not obnoxious to clause seven of section one of chapter 98 of the Code, which forbids the bringing of an action on an oral agreement that is not to be performed within a year? The answer is, "No, because complete performance on the part of plaintiff within the year, as by the death of his father, is not impossible within the terms of the agreement." And this answer was given in *Peter* v. *Compton* (1694) and has been adhered to ever since. See *Peter v. Compton*, 1 Smith, Lead. Cas. (9th Am. from 9th Eng. Ed.) 586, 591; Bish. Cont. § 1284; *Kent* v. *Kent* (1875) 62 N. Y. 560; *Wellington* v. *Apthorp* (1887) 145 Mass. 69, 72 (13 N. E. Rep. 10; *Larimer* v. *Kelley,* 10 Kan. 298; *Jilson* v. *Gilbert,* 26 Wis. 637.

*Eighth.* It is not barred by the statute of limitations, for the statute does not commence to run until the right of action accrues, and such right did not accrue until after the promisor's death, for that was the time fixed; and plaintiff continued the performance of his part of the agreement up to the happening of that event. He then brought suit within two years—five years being the bar. *Kent* v. *Kent,* cited above; *Reynolds* v. *Robinson* (1876) 64 N. Y. 589; *Patterson* v. *Patterson,* 13 Johns. 379; *Price* v. *Price* (1840) 1 Cheves, Eq. 167; *Stone* v. *Todd* (1887) 49 N. J. Law, 275 (8 Atl. 300). Where the promisee serves until the death of the promisor, this question presents no difficulty. It only arises where the promisor breaks or repudiates his contract before death and dismisses the promisee. See *Johnson* v. *Hubbell,* 10 N. J. Eq. 332 (26 Am. Dec. 773, 785, note). See case of *Jincey v. Winfield,* 9 Gratt. 708, 718. In this case the bar of the statute was applied to part of his claim, because he stopped ren-

dering his services and sued the testatrix in her lifetime on the ground that she had disabled herself from making the will promised. It is an authority on the main point. On a promise to pay for a thing by request it begins to run from the death of the person promising. Bish. Cont. § 1354; *Eagan* v. *Kergill*, 1 Dem. Sur. 464; Schouler, Wills (2d Ed.) § 453; Schouler, Dom. Rel. (3d Ed.) § 274. See 2 Pars. Cont. (8th Ed.) pp. 50, 51, notes and cases cited. The statute does not begin to run until the cause of action accrues, and this is the provision in all our statutes. The creditor must first have a perfect right to prosecute his demand according to the civil law. Evans' Poth. 404; 1 Wood, Lim. (2d Ed.) p. 324. § 119, notes. See *Tuckey* v. *Hawkins*, 4 C. B. 655; *Sanders* v. *Coward*, 15 Mees. & W. 56. So, where a contract for services provides that payment shall be made by provision in the employer's will, a right of action does not accrue until after the employer's death, because up to that period there has been no breach. *Nimmo* v. *Walker*, 14 La. Ann. 581. So I have found it laid down in all the cases and books which I have been able to consult that touch upon the subject, and see no reason why this should be an exception to the general rule.

Again, is this due-bill a testamentary paper? It is proven to be wholly in the handwriting of the deceased, Jacob Cann; the body of the instrument as well as the signature. And, taken in connection with what he declared he intended to do by way of compensating plaintiff for his services, and the fact that it was never delivered, it would seem that he intended it to take effect after his death.

The law is well settled that the form is immaterial, or the fact that it is also an obligation made on valuable consideration, if it was intended to take effect after death; it may be regarded as testamentary for purposes of probate. *Ex parte Day* (1851) Bradf. Sur. 476, 482; *Pollock* v. *Glassell* (1846) 2 Gratt. 439, 455. No matter what the form given or intended, provided it be the intention of the deceased that it should operate after his death. *Roberts* v. *Coleman*, 37 W. Va. 143, 151 (16 S. E. Rep. 482). Whether the maker would have called this a testamentary paper or not is one question.

Whether it shall operate as such is a distinct question, that is to be determined by the provisions of the instrument. It depends upon its contents, not upon any declaration of the maker. *Habergham* v. *Vincent*, 2 Ves. Jr. 231; *Patterson* v. *English*, 71 Pa. St. 454; Schouler, Wills, § 272. To determine this, the instrument must be read by the light of all the surrounding circumstances, and, where the instrument itself is silent or equivocal, collateral evidence is admitted in order to show wheher or not a testamentary disposition was actually intended. *Id.* § 273. In this case there is nothing in the scope or bearing of the contents of the instrument that indicates that it is to operate after death, but, in the view I take of it, this is wholly unimportant, for, if genuine, it is certainly competent as an admission on the part of the decedent that he owed plaintiff three thousand dollars for services since he became twenty one years of age, because it is an original entry, shown to be wholly in the handwriting of deceased, against his interest at the time made by him in his book of accounts produced and proved. This is upon the ground that, being against his own pecuniary interest, he could have no motive to make a false entry. *Barton* v. *Scott*, 3 Rand. (Va. 399; *Gale* v. *Norris* (1841) 2 McLean, 469, Fed. Cas. No. 5,190. See *Higham* v. *Ridgeway*, 10 East, 109, 3 Smith Lead, Cas. (9th Am. from 9th Eng. Ed.) 1607, 1617. That this is a good reason for admitting an entry, made by a person deceased, to be evidence, numerous decisions have established beyond all controversy, made since the case of *Higham* v. *Ridgway*, especially against those claiming under and in privity with the deceased. See *Mahaska Co.* v. *Ingalls* (1864) 16 Iowa, 81; *Rand* v. *Dodge*, 17 N. H. 343; *Harriman* v. *Brown*, 8 Leigh, 697; 1 Greenl. Ev. §§ 171, 212; Chamberlayne's Best, Ev. § 518; 2 Am. & Eng. Enc. Law, 467m. That original entries on plaintiff's books may, in certain cases, be evidence for himself, see *Downer* v. *Morrison* (1845) 2 Gratt. 250. See, also, *Griffin* v. *Macauley* (1851) 7 Gratt. 476. Nor is it material that the document has never been delivered or communicated, so as to influence conduct, so as to be effectual as an express promise or as an acknowledgment from which a promise may be implied, or so as for any reason to create

no obligation; it is nevertheless competent and admissible as evidence. *Hickey* v. *Hinsdale*, 12 Mich. 99; *Ayres* v. *Bane*, 39 Iowa, 518; *Atkins* v. *Plympton*, 44 Vt. 21; *Reis* v. *Hellman*, 25 Ohio St. 180; *Huffman* v. *Cartwright*, 44 Tex. 296. It is certainly competent evidence to prove the contract set up by plaintiff in his bill. It is an admission against the pecuniary interest at that time of the party who made the original entry in his book of accounts, proved by producing and proving the original book and the entry to be in his handwriting, and the signature in a suit wherein his heirs at law and privies in estate are defendants. "The universal experience of mankind testifies that as men consult their own advantage, whatever they say or admit against their interest or advantage may, with tolerable safety, be taken to be true against them, at least until the contrary appears." Best, Ev. § 519.

I concur in reversing the decree complained of, and in directing the ascertainment of a *quantum meruit* compensation, although my own opinion is that that was sufficiently ascertained by the commissioner.

---

# CHARLESTON.

