# CHARLESTON.

## STUART, *Admr.* v. NEELY, *Admr.*

Submitted June 17, 1901. Decided December 14, 1901.

1. FRAUDULENT CONVEYANCE—*Consideration—Setting Aside.*

   Where a father in the extremity of death conveys a portion of his property to an adult daughter in consideration of services justly rendered him, such conveyance will not be set aside at the instance of creditors who might have availed themselves

thereof as made for their benefit had they applied in time un-
less it is shown that the consideration therefor is inadequate or
voluntary, or that it was made with intent to delay, hinder
and defraud the grantor's creditors.   (pp. 510, 511, 512).

2. SEPARATION—*Dower.*

   If after marriage a husband become an habitual drunkard his
   wife is justified in leaving and living separate and apart from
   him, and will not be thereby barred of her dower in his estate.
   She need not wait until she loses her health, her limbs or her
   life.   (pp. 512, 513).

Appeal from Circuit Court, Doddridge County.

Bill by W. S. Stuart, administrator, against Annie M. Neely
and others.  From the decree entered certain defendants appeal.

*Reversed in part.*

J. V. BLAIR and W. S. STUART, for appellants.

JOHN BASSEL, for appellees.

DENT, JUDGE:

Thomas E. Davis and Jacob Martin, executors of the last will
and testament of A. S. Core, deceased, and Nannie N. Neely,
appeal from a decree of the circuit court of Doddridge County
entered on the 25th day of July, 1898, in certain consolidated
suits having for their object the settlement of the estate of
Floyd Neely, deceased.

Appellants Davis and Martin complain because the decree
holds valid the deed made by Floyd Neely to his daughter,
Annie M. Neely, on the 5th day of October, 1895, conveying
to her lot No. 18 in the town of West Union in consideration of
the sum of three thousand seventy-six dollars and fifty cents for
her work and services, care and attention performed by her for
her father and sisters after the death of his first wife, which oc-
curred the fifth day of March, 1876, covering a period of nine-
teen years, the compensation being arrived at at an average rate
of one hundred dollars per year with interest added.

The evidence shows that the first Mrs. Neely died on the 5th
day of March, 1876, leaving six daughters, of whom Annie was
the eldest and all of whom were under age; that Annie at the
instance of her father, although she had prepared herself to be
a teacher, assumed charge and management of the household

and continued so until the second marriage of her father in 1883. This marriage proved to be very unhappy. The step-mother after several attempts to live peaceably with her husband finally returned to her friends in Parkersburg in November, 1886. She had been away at numerous times between these dates. For over nine years afterwards Annie remained the head of the household and governess for the children on promise often repeated by her father that he would compensate her for her services, which finally took the form of a promise that he would deed her the home property in consideration of her services. This he did shortly before his death. She in the meantime had the offer of lucrative positions as a teacher which she was compelled to decline owing to her engagement with her father. It is clearly established beyond dispute that after his second marriage, almost to the day of his death, Floyd Neely was an habitual drinker, quarrelsome, abusive and disagreeable to get along with. So much so that his second wife could not live with him. Yet his daughter Annie remained and looked after the household, himself and his children, her sisters. At this she has spent the better part of her life, and probably has endured many things that money could not possibly compensate. There is no doubt, therefore, that she furnished full consideration for the deed. No attempt was made to show the value of the property or that the consideration was inadequate. The claim is that the deed was voluntary and made with intent to delay, hinder and defraud appellants. Undoubtedly the consideration was full and the deed not voluntary. And while the effect thereof is to delay, hinder and prevent the application of the property to a certain extent to the payment of the appellant's debt, yet it was undoubtedly made with the sole intent to pay an obligation which the father considered he justly owed to his daughter. The question then is whether a parent, who is indebted to others, can convey property to a child to whom he is indebted for services rendered without being adjudged guilty of an intent to delay, hinder and defraud other creditors? The authorities hold that he may do so, but that all such transactions are subject to careful investigation and will not be upheld unless entirely free from fraud. *Knight* v. *Capito,* 32 W. Va. 203. What Floyd Neely did on this occasion he did openly and above board and wrote the purpose thereof on the face of his deed. He also knew that in doing so he was merely giving his daughter a

preference which at the instance of any of his creditors in time could be adjudged unlawful and the property could be sold and the proceeds be divided *pro rata* among all his unsecured creditors. So he was only attempting to prefer his daughter subject to the concurrence of his other creditors, they having four months after the deed was admitted to record to have it avoided as a preference and held for the benefit of all creditors willing to attack it. *Wilson* v. *Carrico,* decided at this term.

Hence his deed could not operate to delay, hinder and defraud his creditors without their assent except as to a *pro rata* dividend which his grantee might receive out of the proceeds of the property, which compared with the other debts and arising from a special sale, would be trivial in amount.

The deed was promptly recorded and the appellants seemingly assenting thereto as a just preference, did not attack it. But after the four months had expired, they assail it as fraudulent. Since the enactment of the statute avoiding unlawful preferences by insolvent debtors at the instance of creditors not preferred, the courts are no longer justified to the same strictness in adjudging such deeds made with intent to delay, hinder and defraud, for the reason that they no longer so operate unless the creditors not preferred silently acquiesce therein. Formerly the courts would go a great way to seize badges of fraud and set aside conveyances highly meritorious for the reason that the debtor had shown an undue preference and partiality in total disregard of his other creditors. Now under the law at their own instance the unpreferred can be placed on an equality with the preferred, and therefore they have less reason to complain unless by lack of the diligence the law requires or assent, they lose their equality. Such loss must be attributed to their own *laches* or acquiescence, and not to the deed of the debtor. These appellants had they applied in time had the right to share equally, not dollar for dollar, but *pro rata,* in the property conveyed, with the grantee Annie M. Neely and their debt being many times more than hers, would have taken the bulk of the property and left her but a small portion thereof. They certainly cannot claim that as to this large portion which they might have received, the deed delayed, hindered and defrauded them. They could have had it for the asking. They did not do so, and now it being lost by their own negligence they ask, partly because thereof, the court give them the whole property. The main bulk of the ser-

vices rendered by Annie M. Neely was during the last nine years, when her father's wife could not live with him because of his dissipation. She was then far beyond her majority. Before she was twenty-one he was presumably entitled to her services, but he had the right to pay her therefor as an inducement to keep her at home. It being a continuing contract, the statute of limitations would not apply, for she was not to have the property until she rendered services equivalent to its value. *Cann* v. *Cann*, 40 W. Va. 138. All he deeded her was the reversion, for he retained a life estate in the property. Besides there was a vendor's lien on the property, which she had to pay off out of the money received through a gift from her uncle. Nor is the value of the property shown. It may be much less than the consideration named. It cannot be greater or the appellants would have so proved. The consideration may be in part voluntary, and yet the legal consideration may be more than ample to cover the value of the property. The relationship and the nature of the indebtedness coupled with other things which do not appear in this case, such as inadequacy of consideration, a conveyance of the whole of the debtor's property, or the greater part thereof, or that the debtor made it as a secret trust for his own use, might justify the setting of the deed aside as fraudulent but standing alone they do not furnish a sufficient excuse. To set it aside we rob the grantee of a justly meritorious debt and turn it over to appellants on a claim of equal legality, but of no greater merit. Appellants had the opportunity to have had the full benefit of the deed, themselves, equally with the grantee, and to which she could not possibly have objected, and now to permit them to take the whole property and deprive her of her whole debt would be inequitable and unjust. What they lost by *laches* a court of equity should not be called upon to make up to them unless the case in their favor is so plain that reasonable minds may not differ in regard thereto. The circuit judge after a full consideration refused to set aside the deed, and we cannot see our way open to reverse his judgment.

Nannie M. Neely complains of the same decree because it refused to allow her dower as the widow of Lloyd Neely, deceased, on account of alleged desertion by her. She claims that she was forced to leave him because of his abuse, vile language, personal violence and habits of intoxication. There is some attempt to show that she had been warned in advance prior to her

marriage as to his intemperate habits. But the competent proof fails to show that such was the case. She was married to him in April, 1883. The proof shows that for a short time prior to their marriage he abstained from intoxicating liquor and continued to do so for several weeks afterwards, then he began to drink almost continuously, and became abusive and violent. He was large, handsome and strong. When sober was a gentleman. When drinking he was quarrelsome, profane and pugnacious. She married him, believing him to be sober. Some of her friends knew he was addicted to drinking, but they did not inform her of the fact, and he managed to deceive her prior to their marriage and during their honeymoon. Then he began to give way to his drinking habits, and they grew upon him to such extent that he was three-fourths of the time intoxicated. She was forced to leave him several times, but on his promise of reformation returned to him. At last his drunkenness became so continual and his conduct so abusive and violent that she was forced to leave him and return to her friends in Parkersburg, which was in November, 1886, after they had been married a little over three years. It is established beyond dispute that Col. Neely shortly after his marriage became an habitual drunkard and that while drinking he was quarrelsome, abusive and violent. It is also shown that while he had been addicted to the use of intoxicants prior thereto that during his courtship and for a short time after his marriage, he was duly sober. This establishes the fact that at that time he had complete command over his appetite when he had a sufficient motive for so doing, which was to win a bride and get married. When this purpose was accomplished he permitted the habit to grow upon him until he unodubtedly became its slave—in short, an habitual drunkard. Section 7, chapter 65, Code, provides that if a wife "volunatrily leave her husband without cause such as would entitle her to a divorce from the bond of matrimony or from bed and board, and without such cause and of her own free will, be living separate and apart from him at the time of his death, she shall be barred of her dower." And section 6, chapter 64, provides that "A divorce from bed and board may be decreed for cruel or inhuman treatment, reasonable apprehension of bodily hurt, abandonment, desertion, or where either party after marriage becomes a habitual drunkard." The evidence shows that Col. Neely was not an habitual drunkard during his courtship and marriage, whatever may have been his

habits before. But that after marriage he did become an habitual drunkard, was under the influence of intoxicants almost continuously and was fined and imprisoned for public drunkenness. This undoubtedly gave his wife the legal authority to leave him and live apart from him without forfeiting her right to dower in his estate. No women is longer compelled to live with the worst of all brutes, a drunken brute, to the peril of her health and life, but she has a right to leave him and live apart from him until he furnishes her undubitable evidence of reformation. When asked why she did not apply for a divorce, she answered, "In the first place I do not believe in divorces; second place, I belong to a church that don't approve it (Episcopal church) ; third place, I thought the time might come when the cause would be removed, and we might be together again." When asked what cause she had reference to she answered, "That he would abstain from drink, as he had promised me so often, and then I would go back home if he would give it up, and I had hopes that the time might come." From the evidence the widow appears to have pursued the course pointed out both by the law and her religion, and in doing so she in no sense forfeited her dower. As to the question of dower, the decree being plainly wrong, is reversed, and in all other respects it is affirmed.

*Reversed in part.*